People v. Moore Good morning again. May it please the Court, my name is Amanda Poynter from the Office of the State Appellate Defender, and I represent Mr. Moore. Your Honors, the State presented a theory at trial that Mr. Moore was involved in the equivalent of the shootout at the O.K. Corral. However, evidence at trial suggested that the shootout was one-sided, and those bullets were aimed in the direction of Lonnie and his brother Clifford, not that Mr. Moore was shooting at anyone. Further, Mr. Moore was denied a fair trial when, during the course of the trial, a police officer, a ten-year veteran of the force, testified that Mr. Moore was not given a gunshot residue test because Mr. Moore refused to speak to police. However, the facts of the case are that is not true. The police didn't have a gunshot residue test on hand, and they could not have administered the test to Mr. Moore had he spoken to police. Therefore, Mr. Moore requests that this Court reverse his conviction where the State failed to prove that he possessed a weapon, and further, that they remand his case for a new trial where it was denied his right to a fair trial where Officer Kennedy's use of his constitutional right to remain silent prejudiced him in the presence of the jury. Your Honor, what we know is that Mr. Moore was involved in an altercation with Shane Doyle, and at some point, Shane Doyle pulled out a weapon and fired at Mr. Moore. And this is clear from the evidence. There was physical evidence at the crime scene that Shane Doyle fired a weapon. There was impact points and bullets. Now, Shane Moore – I'm sorry, Lonnie Moore and his brother, upon receiving fire from Shane Doyle, ran from the scene. And in fact, they ran into a police officer less than one minute after the shooting took place. And when they encountered this police officer, they requested assistance and claimed that they were being shot at. Now, despite the lack of time that elapsed between when the shooting occurred and when Mr. Moore ran into the police officer, there was no weapon found on Mr. Moore. Further, at the crime scene, there were no impact points, there were no bullets, there were no shell casings or cartridges anywhere that would indicate that Mr. Moore had fired a weapon or possessed one. In fact, the state presented no physical evidence, even though they claimed that Mr. Moore fired a weapon at Shane Doyle in a densely populated area in front of a house. There was not so much as even a broken window, Your Honor, even though he supposedly discharged a weapon five times. Therefore, the state had to rely completely on witness testimony, and this testimony was all over the place. Some of the witnesses couldn't identify what clothing the defendants were wearing. At one point, one witness said he might have had what looked like a weapon. Further, every witness was almost 100 feet from behind the scene. They were hiding behind refrigerators and looking at this through the lens of hearing gunshots, certainly in a panic. The state failed to show that Mr. Moore ever possessed or discharged a weapon. Now, the jury found Mr. Moore not guilty of discharge, but guilty of possession. Now, while this is not a legally inconsistent verdict, it does defy logic, because the same testimony that they would have found was not credible to determine that he discharged a weapon would have also been the same testimony that the state relied on to show that he possessed a weapon. Now, without this testimony, the state cannot prove that Mr. Moore had a weapon. Therefore, his conviction should be reversed for a lack of evidence. Further, this verdict makes sense in light of what occurred during Officer Kennedy's testimony. Officer Kennedy took the stand, and he was asked why a gunshot residue test was not administered to Mr. Moore. He was asked this repeatedly. It was first elicited by the state. And when the state asked him why a gunshot residue test was not given to Mr. Kennedy, he said, we advised Mr. Moore that Miranda rides, and he said he didn't want to talk to us. So we took him to the detention center. Later, the defense counsel followed up and said, look, why didn't you give him this gunshot residue test? It would have essentially cleared the mystery up on the spot. So the jury was aware that this gunshot residue test was crucial, that had Mr. Moore just submitted to a swab of his hand, the whole thing could have been cleared up. Therefore, the implication for the jury is that Mr. Moore must have been guilty of something. However, this is not the truth. First, the police never needed Mr. Moore's permission to give him a gunshot residue test, any more than they needed Mr. Moore's permission to photograph him or to take his fingerprints. Further, it's later revealed that the reason the police didn't administer a gunshot residue test to Mr. Moore is because they didn't have one on hand. They only had one kit when they arrested Lonnie and Clifford, and they used the first one on Clifford because they talked to him first. Incidentally, the kit was not able to be tested at the state police because they administered the test incorrectly. So when it came time to give Lonnie his test, they didn't have one on hand. Now, a gunshot residue test is only good for six hours, and they contacted the state police, and the state police said it would take up to three hours to get them another test. And Officer Kennedy made the decision not to pursue that because it would cut too close to the window of time, as he said. However, instead of being honest with the jury and just saying, look, we didn't give him a test because we didn't have one on hand, and we decided not to go and get one, he told the jury multiple times, at least four separate times, that they didn't give a gunshot residue test to Mr. Moore because Mr. Moore refused to speak with police. Now, first, the use of Mr. Moore's right to remain silent against him is a separate constitutional violation under Dole v. Ohio, because the natural inference is that someone who refuses to speak to the police must have something to hide. He must be guilty of something. And the jury is naturally prejudiced by the defendant's use of his constitutional rights. But it's even more prejudicial in this case because not only are we telling the jury that Mr. Moore refused to speak to the police, but we're telling them that Mr. Moore refused to speak to the police and clear up a simple matter and have his hand tested for gunshot residue, something that the jury was told could have cleared up this mystery right on the spot. Moreover, Kennedy should have known as a ten-year veteran of the force that, one, he shouldn't refer to Mr. Moore's right to remain silent, and, two, that what he was saying was disingenuous at best, that he didn't need permission to give Mr. Moore a gunshot residue test, and, further, that they didn't have one on hand. Therefore, the jury's only conclusion would have been that Mr. Moore must have possessed a weapon or else he would have submitted to that gunshot residue test. For this reason, Mr. Moore was prejudiced by Officer Kennedy's testimony. And unless this court has any other questions, Mr. Moore would respectfully request that this court reverse his conviction where the state failed to prove that he possessed the weapon, or alternatively, to remand this case for a new trial where Officer Kennedy is not allowed to use his right to silence against him. Thank you. Good morning, Your Honors. Counsel. The defendant's argument is remarkable for what it leaves out of the people's case. And I will attempt to supply that for this court and supply the correct standard, which is that the evidence presented below should be considered in the light most favorable to the state and that issues of credibility and resolution of conflicts of evidence were for the jury to make. The defendant below stipulated that he was a convicted felon. So the first element of unlawful possession of a weapon by a felon was stipulated. The only issue was, did the defendant possess a weapon? And the evidence is overwhelming that he did. Michael Pass first testified that he was asked by the defendant to relay a message to Shane Doyle that he wanted him to come out and fight. Now, the defendant, of course, claims that he shot and that he possessed a toy gun, a toy cat gun. It's just unbelievable that he, I mean, and it's not disputed that the defendant shot something because he says he did shoot a toy cat pistol and that it could have been mistaken for a real gun because it looked like one and it sounded like one, according to the defendant. Shane Doyle does come out and he does, there's a confrontation with the defendant and his brother. Shane Doyle says that he saw the defendant raise his brother Clifford's shirt and that he saw a revolver and the cylinder. The people explained why there were no bullets or impact points found from that, from the firing of a revolver, was that it doesn't eject a shell. There would be no cartridges to be found. And second, if the projectile shot from this revolver hit nothing, it could have gone on into parts unknown and would not have been discovered or it could have disintegrated. So the lack of impact points from the gun that the defendant fired was explained and it was explained in a reasonable manner. Shane Doyle testified that the defendant shot at him four times. The jury apparently rejected that fact and saw Shane Doyle's testimony with some suspicion because he was shooting at the defendant as well. This is a gun battle. So the jury did not convict the defendant of aggravated discharge of a firearm because apparently not that they didn't believe he discharged one, but that they didn't believe that he discharged it at Shane Doyle. No other witness testified that he discharged the weapon at Shane Doyle. But Shane Doyle, nonetheless, describes the gun that is in the defendant's possession and describes the fact that he does shoot it. He's not the only one. The defendant's aunt, Augusta Williams, saw the defendant shoot the gun, she says, four times. And her testimony pretty much agrees with Shane Doyle's. And she demonstrated how this is not a toy cat pistol. She demonstrated how the defendant had his arm out and how he fired it and when he fired it, it had a kickback. So she was very detailed in her testimony about it. If you took it in the light most favorable to the defendant, you might find that she couldn't see, but there was testimony by the inspector that from the point that Augusta Williams was at, at her house, when she had come out from behind the refrigerator, she could see because her property was on a slight elevation and she could have seen someone by the brick wall discharging a weapon. The jury apparently decided to credit both Shane Doyle and Augusta Williams about the defendant possessing and firing the firearm. But that wasn't the only witness that saw the defendant with this gun. There was also Candace Riley and Crystal Riley. Candace was approaching, she followed the defendant and his brother up the street because she wanted to see what kind of rumble was going to go on and then when the gun gets pulled out, she panicked. But she ran and she explained that she ran toward the defendant and passed him when he took the gun out because she thought at that point, no matter which way she ran, she would have been a target. So she ran for the point of safety, which was beyond the defendant, toward her aunt's house. And the jury reasonably credited her testimony that she saw the defendant take the gun from his brother's waistband and hold it in the air. She didn't see him firing, but she did hear gunshots and she was certain that what she heard was gunshots. Crystal observed from a different point on that street, her sister, and observed the defendant remove the gun from his brother's waistband. She saw it when it was lifted up and she could see the handle. She was certain that it was a firearm. So the jury could have, a reasonable jury, given all this testimony, could have found that the defendant did possess a weapon and that he was a felon and could have found him guilty beyond a reasonable doubt. Now, as to comments on the defendant's right to remain silent, well, the problem with that is the defendant did not remain silent. The defendant waived his rights by voluntarily talking, initiating a conversation and talking about the events of that evening. He initially did not want to talk and he doesn't claim that his right to remain silent was not scrupulously honored and he doesn't claim that he was coerced into making the statements that he made later. There's no problem with that. So wherein lies the Doyle violation? He did not remain silent. But the argument doesn't follow. The other thing is that, yes, the first mention of his initial invocation of the right to remain silent did happen, was initiated, was elicited by the state. But then after that, it was elicited and talked about by the defendant a whole lot more. And, in fact, the defendant, when he testified and he did testify, began to fault the police for not talking to him. So he can't really have it both ways. He can't say he was prejudiced because they talked about his right to remain silent and how they scrupulously honored that and then turn around and then fault the police for not talking to him when he wanted to tell them about the cat gun. He should be stopped from any kind of argument to that effect. In any event, if it was error to talk about the initial assertion of his right to remain silent, that was harmless error, applying the five factors that were set out in HART. The first factor was who elicited it. And, yes, the people initially that elicited it. But they made no use of that. They made no argument that the defendant's silence meant anything, that, in fact, it was the defendant who elicited much more testimony by his initial invocation of the right, and he was the one who argued it in a negative manner that he faulted the police for not coming to talk to him after he, you know. And that was his explanation for why he did not initially mention the fact that he had the cat gun as opposed to a real gun. The fact that the defendant was not asked to submit to a gunshot residue test was fully explored. That department had no required state police approved GSR test, being equipment or test kit. They had none. The one that they used on the defendant's brother was not a standard test kit, was not an approved test kit, and it was not, although it was submitted that the state police refused to test it. So no testing was done. Was there any testimony that would a cat gun residue be the same as a regular weapon? It's a gun powder of some kind. It's probably a black powder. I don't know. Was there any testimony of that in the record, that if he had a cat gun and fired it, it would give a gunshot residue? No, that wasn't explored. But the defendant himself could not describe the cat gun beyond saying that it looked real, except for the red tip. Was it round caps or was it in line? Did he describe that? That was asked because the only person who would have knowledge of that would have been the defendant because no weapon was ever found and no cat gun was ever found. Did he ever testify as to whether they were round caps or in line? He could not testify. He did not know what kind of caps went in this alleged cat gun, and he did not know how to load it. And he was questioned about that. He knew nothing about that. He just made the bare claim that he had a cat gun that was his nephew's and that he fired it, and that it sounded like a real gun. Beyond that, there was nothing. But the witnesses who actually saw the gun and who actually saw the defendant fire the gun, described an actual weapon, not a cat gun, and they described a kickback when it was fired. Are there any questions? First, Your Honors, the record reveals that Mr. Moore did testify that he had a cat gun, but it also revealed that he had taken that cat gun from his nephew almost immediately before the incident. So he wouldn't necessarily have known that much about the gun other than its outward appearance. Moreover, it's... Well, in his outward appearance, did he say it was a revolver or an automatic? I don't believe that was brought up, Your Honor. And there was also no testimony whatsoever that would have indicated that a gunshot rescue test would have determined that, would have shown up if he had fired a cat gun. There was no evidence in the record on that at all either, Your Honor. Further, the state tried to explain the fact that Mr. Moore fired a weapon four times, and there was no testimony that he fired it in the air, but that he fired it at Shane Doyle. And if you look at the pictures in the record, you can see that this was in front of a home. It was a very densely populated area with lots of objects in the way. And certainly one bullet might have missed, and one bullet might have disintegrated. But four separate bullets fired at this range would have hit nothing, would have cracked not a single window. Even if it was, in fact, a revolver so that there were no shell casings, it's simply unbelievable that he could have fired four times with a group of more than roughly 10 people standing there in front of a house and hit absolutely nothing. Further, Your Honors, the state asserts that simply because Mr. Moore later spoke with police, that the police's comments on his Fifth Amendment rights are inapplicable. But what's missing here is that the state, or Officer Kennedy, commented on his Fifth Amendment rights, not just to say he refused to speak with us, but in essence to explain why he didn't take a gunshot residue test. That's not responsive. In fact, every time Officer Kennedy was asked why a gunshot residue test was given, it wasn't explained that we didn't give him one because we didn't have one, which would certainly have been the responsive answer. Instead, they explained we didn't give him a gunshot residue test because he refused to cooperate with us. And so even though defense counsel technically elicited this information, it was nonresponsive. When defense counsel said, hey, why didn't you give him a gunshot residue test and clear up this mystery, he anticipated that Officer Kennedy would have said, well, because we didn't have one, not that Officer Kennedy would have repeatedly said we didn't give him a gunshot residue test because he wouldn't cooperate with police. Later, Mr. Moore did in fact testify that he asked the police to give him a gunshot residue test, and he later explained that he did talk to police. But by this point, the jury had already been prejudiced. They were already under the impression that Mr. Moore refused to take a gunshot residue test and that he wouldn't cooperate with police. Therefore, he shouldn't be stopped from then explaining actions that were elicited in front of the jury in nonresponsive answers by Officer Kennedy. He was simply dealing with the situation in the best way he could after Officer Kennedy testified in an inappropriate manner and then used his Fifth Amendment rights to remain silent against him. Was there any kind of instruction on this? No, there was not, Your Honor. And was there ever an objection? There was not an objection, and for that reason, Mr. Moore has also claimed that his counsel was ineffective. So if this court would have reversed absent an objection or absent an instruction from the jury. Was there any post-trial, I mean, in the motion? There was nothing in the post-trial motion either, Your Honor. This was the first time it came up. This was the first time it came up, Your Honor. But if this court would reverse but for a post-trial motion, then counsel was ineffective, and therefore, Mr. Moore should be entitled to a new trial. Thank you.